IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-00046-RBJ

JAMIYL KHABIR BROWN,

    Plaintiff,

v.

THOMAS M. BRUCE,
WILLIAM A. SEIWALD, JR., and
CARLOS RAFAEL ZUNIGA,

    Defendants.

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on defendants Thomas M. Bruce and William A. Seiwald, Jr. (collectively, "Denver defendants")'s motion for summary judgment. ECF No. 38. For the reasons stated herein, the motion is GRANTED.

**I.  BACKGROUND**

In the early morning hours of January 18, 2018, Earl Motton fired a gun into the ceiling of a homeless shelter in the gymnasium of a Lakewood church. ECF No. 45-8 at 1. Lakewood Police Officer Harold Horton arrived at the scene to investigate. ECF No. 45-8 at 1. Although the gun was quickly recovered, the suspect remained at large. ECF No. 45-6 at 4–5. Officer Horton described the suspect over Lakewood Police Department ("Lakewood") dispatch, including: Earl Motton's name, that he was a "black male about 30 years old average height medium build short hair," and that he was last seen wearing a "gray hoodie and blue jeans." *Id.*

at 5.

Officer Horton also noted over dispatch that an armed, plain clothes Lakewood Police Officer with the last name Vandiver was in the field. *Id.* at 7. Officer Horton aired a description of Officer Vandiver, presumably to avoid confusion with the suspect Earl Motton. *Id*. Officer Horton described Officer Vandiver as wearing "[o]live pants, green jacket, [and] black knit cap" and carrying "an AR." *Id*.

Another officer mistakenly believed that the description of Officer Vandiver was of the suspect Earl Motton, and the officer told Lakewood dispatch to update the notes to reflect that. *Id.*; ECF No. 38-4 at 3. Shortly thereafter yet another officer informed Lakewood dispatch that the suspect was no longer wearing the black knit cap. ECF No. 45-6 at 7.

Lakewood dispatch called Regional Transportation District ("RTD") dispatch twice to provide descriptions of the shooting suspect. First, at approximately 6:38 a.m., Lakewood dispatch gave RTD dispatch the description of a black male suspect of about thirty years of age, with a medium build and short hair. ECF No. 38-12 at 1. Second, at approximately 7:08 a.m., Lakewood dispatch called RTD dispatch again and the description was updated to include: "Earl Motton . . . [last seen wearing] [black] cap, green jacket and olive pants." *Id*. While this name was correct, this clothing description was mistakenly that of Officer Vandiver. RTD dispatch aired both descriptions immediately after receiving them. *Id*.

Lakewood also obtained a mugshot of Earl Motton from his prior criminal record, which they sent to surrounding police departments at approximately 7:29 a.m. ECF No. 45-6 at 9; ECF No. 38-4 at 3.

At approximately 8:31 a.m., a group of armed Transit Safety Officers ("TSOs") employed as RTD security spotted an individual on a light rail train at the Lamar station who

matched the description of a black male wearing a "black hat, green jacket, green pants." ECF No. 45-3 at 1. One of the TSOs noted that the individual had a "grey backpack," which dispatch had not included in its description of the suspect. *Id*. The TSO suggested that they should "find out if there was a backpack involved," but another TSO immediately radioed in the possible suspect to RTD dispatch. *Id*.

Defendants Denver Police Officer Thomas M. Bruce and Denver Police Corporal William A. Seiwald, Jr. (the "Denver defendants") were working off-duty as RTD security that morning. ECF No. 38 ¶ 1; ECF No. 45 at 6. Officer Bruce and Corporal Seiwald were working together in a vehicle provided by RTD, which was not equipped with a computer or mobile data terminal. ECF No. 38 ¶ 2; ECF No. 45 at 6. As such, the Denver defendants relied on their RTD radios for information. ECF No. 38 ¶ 2; ECF No. 45 at 6. Officer Bruce also had access to his Denver Police Department ("DPD") radio. ECF No. 38-1 at 26:3–12.

The Denver defendants were on duty at the times that RTD dispatch aired both descriptions of the shooting suspect and could have heard them on their radios. ECF No. 38-1 at 12:5–12:21. However, the Denver defendants allege that it is very common to hear such descriptions over dispatch and that they had no reason to pay special attention to these descriptions. ECF No. 38-2 at 41:5–43:15. Officer Bruce and Corporal Seiwald both testified that they did not recall hearing the descriptions. ECF No. 38-1 at 22:25–23:24; ECF No. 38-2 at 41:5–42:23, 48:4–49:1.

At approximately 8:45 a.m., RTD dispatch ordered the Denver defendants by radio to the Decatur-Federal light rail station to respond to the possible shooting suspect sighted by the TSOs. ECF No. 38 ¶ 3; ECF No. 45 at 6. Officer Bruce testified that RTD dispatch reported to the Denver defendants at that time that the suspect was "a black male, 30 years old, medium

3

build, short hair" and "wearing a green jacket, olive pants, black cap." ECF No. 38-1 at 21:10–22:24. The Denver defendants assert that they did not know the suspect's name. ECF No. 38-1 at 22:25–23:24; ECF No. 38-2 at 48:4–49:1. Officer Bruce received the same description of the suspect's clothing from DPD dispatch prior to arriving at the train station. ECF No. 38-1 at 26:3–12.

Plaintiff disputes whether the Denver defendants had been provided the entirety of this description. ECF No. 45 at 6–7. Plaintiff asserts that RTD dispatch provided the Denver defendants only a description of the suspect's race, gender, and clothing but not the age, build, or hair length. *Id.*

The Denver defendants arrived at the light rail station at approximately 8:54 a.m. ECF No. 38-3 at 2. They were met by the TSOs who had called in the possible suspect. ECF No. 38-1 at 23:4–21. One of the TSOs gave the Denver defendants the description of the individual. *Id.* at 23:4–21. They walked over to the individual together, and the TSO pointed the individual out. *Id.* The Denver defendants observed that the individual matched the suspect's description. ECF No. 38 ¶ 11; ECF No. 45 at 7. Again, plaintiff disputes the exact description provided to the Denver defendants, but it is undisputed that the Denver defendants at least observed that the individual matched the description of a black male wearing a green jacket, olive pants, and a black cap. ECF No. 38 ¶ 11; ECF No. 45 at 7.

Unbeknownst to the Denver defendants at the time, the individual in question was not Earl Motton but rather plaintiff Mr. Jamiyl Brown. Mr. Brown was wearing a backpack, glasses, and distinctive rings, and had a beard and long dreadlocks. ECF No. 45 at 11; ECF No. 52 at 4.

The Denver defendants asked Mr. Brown to deboard the train without informing him why. ECF No. 38-1 at 25:2–11; ECF No. 45 at 11; ECF No. 52 at 4. Mr. Brown deboarded the

train without incident. ECF No. 38 ¶ 14; ECF No. 45. Within less than thirty seconds of deboarding, Mr. Brown was surrounded by TSOs, while Corporal Seiwald began performing a pat-down search, Officer Bruce asked Mr. Brown whether he was carrying any weapons. ECF No. 38 ¶ 15; ECF No. 45 at 8. Mr. Brown reported that he was carrying a handgun, which Corporal Seiwald recovered. ECF No. 38 ¶ 15; ECF No. 45 at 8. Mr. Brown's gun was a nine millimeter, the same type of gun involved in the church shooting incident, although it is not clear whether the Denver defendants knew what type of gun was used in the shooting. ECF No. 38 ¶ 16; ECF No. 45-6 at 4–5. Meanwhile, one of the TSOs, Carlos Zuniga, "had the hood of his gun unsnapped with his hand on the handle." ECF No. 45-3 at 2.

Shortly after Mr. Brown deboarded the train, DPD dispatch aired that the information pertaining to the individual on the train was "secondhand" information relayed to DPD through the Lakewood Police Department rather than DPD. ECF No. 45 at 12; ECF No. 52 ¶ 20.

Corporal Seiwald placed Mr. Brown in handcuffs. ECF No. 38 ¶ 17; ECF No. 45 at 8. The Denver defendants then asked Mr. Brown for identification, moved him further from the train, and obtained Mr. Brown's identification from a wallet in his front pocket. ECF No. 38 ¶ 17; ECF No. 45 at 8. Officer Bruce asked Mr. Brown whether he had a license to carry a concealed weapon, and Mr. Brown responded that he did not. ECF No. 38 ¶ 18; ECF No. 45 at 8. The Denver defendants knew that it was illegal to carry a gun without a permit. ECF No. 38 ¶ 18; ECF No. 45 at 8. This conversation occurred less than five minutes after the Denver defendants first encountered Mr. Brown. ECF No. 38 ¶ 18; ECF No. 45 at 8.

The Denver defendants were informed that Lakewood police officers were on their way. ECF No. 38 ¶ 19; ECF No. 45 at 8. The Denver defendants conducted a more thorough search and then moved Mr. Brown to a DPD patrol vehicle. ECF No. 38 ¶ 19; ECF No. 45 at 8.

Lakewood police officers arrived with the mugshot of the shooting suspect that had been circulated. ECF No. 38 ¶ 20; ECF No. 45 at 8. Using the mugshot, they determined that Mr. Brown was not the shooting suspect. ECF No. 38 ¶ 20; ECF No. 45 at 8. The Denver defendants then released Mr. Brown with a citation. ECF No. 38 ¶ 21; ECF No. 45 at 8. The entire incident lasted approximately forty minutes. ECF No. 38 ¶ 22; ECF No. 45 at 8.

Procedural Background

On January 8, 2019 Mr. Brown filed a complaint against Officer Bruce, Corporal Seiwald, and TSO Zuniga. He alleges two causes of action pursuant to 42 U.S.C. § 1983: unlawful detention in violation of the Fourth and Fourteenth Amendment and unlawful arrest in violation of the Fourth and Fourteenth Amendments. ECF No. 1 ¶¶ 55–74.

On November 27, 2019 Officer Bruce and Corporal Seiwald filed a motion for summary judgment. ECF No. 38. They argue that both of Mr. Brown's claims fail because their actions were reasonable and because qualified immunity applies. *Id.* at 7–8.

## II. STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

### III.  ANALYSIS

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . shall not be violated." U.S. Const. amend. IV.  The Tenth Circuit has recognized three categories of police-citizen encounters:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) (quoting *United States v. Davis*, 94 F.3d 1465, 1467–68 (10th Cir. 1996)) (internal quotation marks and alterations omitted).

"These categories are not static.  A consensual encounter may escalate into an investigative detention.  An investigative detention may escalate into a full-blown arrest, or it may de-escalate into a consensual encounter." *Id.* at 1500.  "A reviewing court must analyze each stage of the encounter, ensuring that the requisite level of suspicion or cause is present at each stage." *Id*.

To justify an investigatory stop, law enforcement officers must "have an articulable, individualized, reasonable suspicion that an individual is involved in some criminal activity." *United States v. Rascon-Ortiz*, 994 F.2d 749, 752 n.3 (10th Cir. 1993).  The Supreme Court has defined reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity" under a "totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).  This is not an "onerous standard;" it "requires

7

'considerably less' than a preponderance of the evidence and 'obviously less' than probable cause." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (quoting *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011)).

"The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; 'common sense and ordinary human experience must govern over rigid criteria.'" *United States v. Neff,* 300 F.3d 1217, 1220 (10th Cir. 2002) (quoting *United States v. Sharpe,* 470 U.S. 675, 685 (1985)). An investigative detention must be: "(1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) (quoting *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotations omitted). If the seizure fails this two-pronged test, then it becomes an arrest that must be supported by probable cause rather than reasonable suspicion. *See id.* (citing *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010)). "An arrest is distinguished from an investigative *Terry* stop by the involuntary, highly intrusive nature of the encounter." *United States v. White,* 584 F.3d 935, 952 (10th Cir. 2009) (quotation marks omitted).

The parties dispute at what point the encounter between Mr. Brown and the Denver defendants became an arrest; whether the Denver defendants had the requisite level of suspicion or cause at each stage; and whether defendants are entitled to qualified immunity. The encounter can be broken down into in four stages: (1) the initial stop and removal from the train; (2) the pat-down search; (3) the use of handcuffs; and (4) the formal arrest once Mr. Brown admitted to possessing a concealed handgun without the proper permit. The Denver defendants assert that the encounter began as an investigative detention and became an arrest only once the Denver defendants formally arrested Mr. Brown. ECF No. 38 at 8. Mr. Brown argues instead that the

8

encounter was an arrest from the moment he was removed from the train.[1]  ECF No. 45 at 18–19 ("Mr. Brown was unquestionably arrested as soon as Denver Defendants contacted him.").

### A. Initial Stop and Removal from the Train

The initial stop and removal from the train constituted an investigatory stop, and the Denver defendants did have reasonable suspicion to effect it.  "The Supreme Court has acknowledged that 'there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigative detention.'"  *United States v. White*, 584 F.3d 935, 953 (10th Cir. 2009) (quoting *Fla. v. Royer*, 460 U.S. 491, 504 (1983)).  The Supreme Court gave the example of moving a suspect from an airport concourse to a more private area as a transfer that would not transform an investigatory detention into an arrest.  *See Royer*, 460 U.S. at 504.  Moving a suspect off a train and onto a train platform is of comparable invasiveness as moving a suspect from an airport concourse to a more private area.

Mr. Brown argues that the initial stop and removal from the train was a "show of official authority" sufficient to constitute an arrest because upon deboarding Mr. Brown was surrounded by a group of armed TSOs, one of whom placed his hand on the handle of his gun.  ECF No. 45 at 19.  Mr. Brown proffers no comparisons from precedent.  He does include a general citation to *United States v. Ritchie*, in which the Tenth Circuit held that similar facts constituted an investigative detention rather than an arrest.  *See* 35 F.3d 1477, 1481 (10th Cir. 1994).  In *Ritchie*, the plaintiff was backing his car out of his garage when "several FBI agents blocked his path with their vehicles.  Without any guns drawn, the agents asked Mr. Ritchie to exit his

---

[1] Notably, Mr. Brown's complaint alleges that the encounter began as an investigative *Terry* stop.  ECF No. 1 ¶ 57, 61.  Mr. Brown's first cause of action is one for unlawful detention, in contrast to his second cause of action for unlawful arrest.  Id. at 9, 11.  Yet Mr. Brown's response to the Denver defendants' motion for summary judgment appears to abandon his claim for unlawful detention by categorizing the entire encounter as an unlawful arrest.  Regardless, it is my duty to analyze each stage of this encounter to ensure that the requisite level of suspicion or cause is present.

vehicle. They performed a quick pat-down search and explained the purpose of the stop." *Id.* at 1479.

Similarly, here the Denver defendants requested that Mr. Brown deboard the train without drawing guns or using any other physical force. Though armed TSOs surrounded Mr. Brown when he deboarded, this is comparable to the FBI agents blocking in the plaintiff's car in *Ritchie*. *See* 35 F.3d at 1479. The fact that one of the TSOs had his hand on the handle of his gun is not sufficient to distinguish this case. Such a minimal use of force was "reasonably related to the circumstances which justified the interference in the first place" given that Mr. Brown was, at that time, a shooting suspect thought to possibly still possess a gun. *Salas-Garcia*, 698 F.3d at 1248. Thus, this was an investigative detention.

The Denver defendants did have reasonable suspicion to effect this investigative detention. Their "particularized and objective basis for suspecting [Mr. Brown] of criminal activity" included the information they received from RTD dispatch and the TSOs who met them at the rail station, as well as their own observations. *Cortez*, 449 U.S. at 417–18 (1981). RTD dispatch ordered them to the rail station to respond to the possible shooting suspect as reported by the TSOs. RTD dispatch told the Denver defendants at that time that the suspect was a black male wearing a green jacket, olive pants, and a black cap. The Denver defendants claim that RTD dispatch also told them that the suspect was "30 years old, medium build, short hair," though Mr. Brown disputes this additional information.[2] Upon arrival at the rail station, the TSOs pointed Mr. Brown out, and the Denver defendants confirmed that Mr. Brown matched the description they had been given.

---

[2] This dispute is not a genuine dispute of material fact sufficient to overcome summary judgment because, as described in detail below, the outcome is the same regardless of which party is correct.

Mr. Brown argues that there were "numerous obvious characteristics of Mr. Brown's appearance that would have been more likely to make it into a description of him than the color of his clothing." *Id*. at 17. Mr. Brown had glasses, a tan backpack, a beard, and "long dreadlocks." I find that the fact that Mr. Brown matched the description of the suspect but also had additional notable characteristics does not negate reasonable suspicion here. However, "long dreadlocks" is contrary to Lakewood dispatch's description of the suspect as having "short hair." Interestingly, as noted, Mr. Brown himself disputes that the Denver defendants received the description of "short hair." Regardless, reasonable suspicion is not an "onerous standard" and takes into consideration "the totality of the circumstances." *Pettit*, 785 F.3d at 1379. Even construing the facts in Mr. Brown's favor by assuming that the Denver defendants were given the description that included "short hair" (contrary to Mr. Brown's own assertions), Mr. Brown still matched each of the other seven descriptors: a black male, 30 years old, medium build, wearing a green jacket, olive pants, and a black cap. Alternatively, assuming that Mr. Brown's version of events is correct, and the Denver defendants did not receive the description that included "short hair," then Mr. Brown matched every single one of the five descriptors: a black male wearing a green jacket, olive pants, and a black cap.

The totality of the circumstances—the extent to which Mr. Brown matched the suspect's description, the seriousness of the crime at issue, and the relatively minimal level intrusion of removing Mr. Brown from the train—show that the investigative detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) (quoting *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotations omitted).

Separately, it is true that the Denver defendants were acting on misinformation. The clothing description that Lakewood Police provided to them through RTD was that of plain clothes Officer Vandiver, not the suspect Earl Motton. But the Tenth Circuit has held that "[a] mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." *United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996) (quoting *United States v. Ornelas–Ledesma,* 16 F.3d 714, 718 (7th Cir. 1994), *judgment vacated on other grounds,* 517 U.S. 690 (1996)); *see also United States v. Cunningham*, 630 F. App'x 873, 876 (10th Cir. 2015) ("An officer's reasonable mistake of fact does not a constitutional violation make.").

Relatedly, Mr. Brown argues that the Denver defendants acted unreasonably because they breached their "duty to investigate the facts available to them." ECF No. 45 at 14. He does not specify what this duty should have entailed in this context. He asserts only that the Denver defendants improperly delegated their alleged duty to investigate by "assum[ing] that RTD TSOs had identified a potential match of a wanted suspect without simple inquiry about the details." ECF No. 45 at 18. The apparent insinuation is that the Denver defendants should have called Lakewood dispatch themselves to obtain information on the suspect, which likely would have yielded the proper description of the suspect's clothing, the suspect's name, and the fact that the suspect was likely no longer armed.

I appreciate Mr. Brown's frustration. He was stopped only because of an error in Lakewood dispatch's reporting of the suspect's description. But per Tenth Circuit precedent, this was not the Denver defendants' error. It was reasonable for the Denver defendants to "rely on the reasonably trustworthy information provided to them by the dispatcher, even though the information was later determined to be faulty." *Miller v. City of Nichols Hills Police Dep't*, 42

12

F. App'x 212, 216 (10th Cir. 2002); *see also Albright v. Rodriguez*, 51 F.3d 1531, 1536 (10th Cir. 1995) ("Officers may rely on information furnished by other law enforcement officials to establish reasonable suspicion.") (citing *United States v. Maestas*, 2 F.3d 1485, 1493 (10th Cir. 1993)). The Denver defendants had no reason to question the reliability of the information at this stage.

Mr. Brown's cited cases do not support a duty to investigate in this context. For one, each of Mr. Brown's cited cases involve arrests, not investigative detentions. *See Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007); *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998); *Romero v. Fay*, 45 F.3d 1472 (10th Cir. 1995). For another, Mr. Brown defines the "duty to investigate" in these cases too broadly. In *Romero v. Fay*, the Tenth Circuit held only that officers are required "to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." 45 F.3d at 1476–77. The court expressly rejected the plaintiff's argument that the officers had a more affirmative duty to seek out plaintiff's alleged alibi witness. *See id.* at 1477. Here, it is undisputed that a crime had been committed; that the Denver defendants had a description of the suspect which largely matched Mr. Brown; and that no other witnesses or basic evidence were readily available at the scene.

Mr. Brown also cites to *Baptiste v. J.C. Penney Co.*, wherein the Tenth Circuit held that it was a constitutional violation for officers to "rely solely on a security guard's allegations" about a shoplifter when the officers had access to a videotape of the alleged shoplifting. *See* 147 F.3d at 1257. Such reliance on the security guard "would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination." *Id.* at 1259. Yet here, the Denver defendants did not rely entirely on the allegations of the TSOs. The

Denver defendants had been given the description of the suspect from RTD dispatch, and they visually confirmed for themselves that Mr. Brown matched that description after the TSOs pointed him out. Even assuming that such a duty to investigate extends beyond arrests to investigative detentions, the Denver defendants did not delegate that duty.

Finally, Mr. Brown cites to *Cortez v. McCauley*, 478 F.3d at 1108. In *Cortez*, a nurse reported to officers that a woman had brought in her "barely verbal" two-year-old daughter who had complained to the mother that her babysitter's husband had "hurt her pee pee." *See id.* at 1116. The Tenth Circuit held that it was a constitutional violation to arrest the husband without "waiting to receive the results of the medical examination of the child, interview the child or the mother to better understand the circumstances, or seek to obtain a warrant." *Id*. Mr. Brown argues that just as the officers in *Cortez* improperly relied on double-hearsay, here the Denver defendants improperly relied on "much more than double hearsay." ECF No. 45 at 16.

Yet this case does not involve a "barely-verbal two-year old child" with an unclear statement passed through two witnesses. *Cortez*, 478 F.3d at 1116. Nor was there ever any uncertainty that a crime had occurred. Rather, RTD dispatch relayed information about a suspect to both the Denver defendants and the TSOs; the TSOs reported a match of that description; and the Denver defendants arrived and independently confirmed that match. Even assuming that *Cortez* extends beyond arrests to investigative detentions, the Denver defendants did obtain "reasonably trustworthy information indicating that a crime had been committed by" Mr. Brown before detaining him. *Cortez*, 478 F.3d at 1116–17.

Mr. Brown has failed to show that the Denver defendants breached any alleged duty to investigate. I find that the Denver defendants did not violate the Fourth Amendment by stopping Mr. Brown and removing him from the train.

### B. Pat-Down Search

The pat-down search did not escalate the investigative detention into an arrest. The Tenth Circuit has explained that "[d]uring an investigative detention, police officers are authorized to take reasonable steps to secure their safety and maintain the status quo" and that such "safety measures may include a pat-down search for weapons." *United States v. Garcia*, 459 F.3d 1059, 1063 (internal quotation marks, alterations, and citations omitted). A pat-down search is allowed where the officer "harbors an articulable and reasonable suspicion that the person is armed and dangerous." *Id.* at 1064.

Here, the Denver defendants knew that they were looking for a shooting suspect and thus had articulable and reasonable suspicion that Mr. Brown could still have the gun that the shooting suspect discharged at the church. It is true that shortly after Mr. Brown deboarded, DPD dispatch aired that the information pertaining to the individual on the train was "secondhand" information relayed to DPD dispatch through the Lakewood Police Department. ECF No. 52 ¶ 20. Yet the information about the suspect was only "secondhand" to the extent that DPD had yet not confirmed it for themselves at that point. The information became "firsthand" as soon as the Denver defendants arrived, spotted Mr. Brown, and confirmed for themselves that he was a match for the proffered description. As such, I find that the Denver defendants did not violate the Fourth Amendment by initiating a pat-down search of Mr. Brown.

### C. Use of Handcuffs

The use of handcuffs did not escalate the investigative detention into an arrest. "'[T]he use of firearms, handcuffs, and other forceful techniques' generally exceed the scope of an investigative detention and enter the realm of an arrest." *See Cortez v. McCauley*, 478 F.3d 1108, 1115–16 (10th Cir. 2007) (quoting *United States v. Melendez–Garcia,* 28 F.3d 1046, 1052

15

(10th Cir. 1994)). However, the use of such techniques does not necessarily transform an investigative detention into an arrest if "the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (quoting *United States v. King,* 990 F.2d 1552, 1562 (10th Cir. 1993)) (internal quotations omitted).

In particular, the use of handcuffs during an investigative detention is reasonable when used to "maintain the status quo during the course of [the detention]." *United States v. Neff*, 300 F.3d 1217, 1220–21 (10th Cir. 2002). The Tenth Circuit recently noted that "in the cases where we have upheld officers' brandishing of firearms and use of handcuffs during an investigatory *Terry* stop, the officers generally either knew or had reason to believe that the suspects were armed, or they had personally witnessed the suspects acting violently." *United States v. Soza*, 686 F. App'x 564, 568 (10th Cir. 2017).

For example, in *United States v. Shareef*, the Tenth Circuit found that it was a reasonable investigative detention where officers forcibly removed defendants from their vehicles at gun point, patted them down, handcuffed them, and ordered them to kneel on the pavement, because the officers had "received information that led to them to believe that [one of the] defendant[s] was armed and dangerous." 100 F.3d 1491, 1502 (10th Cir. 1996). Similarly, in *United States v. Perdue* the Tenth Circuit found that it was a reasonable investigative detention where officers ordered occupants out of a car at gunpoint and forced them to lie on the ground, because the officers had information to suggest that the suspects might be armed, it was late at night in a remote area, and there were only two officers. *See* 8 F.3d 1455, 1463 (10th Cir. 1993). In *United States v. Paetsch*, the Tenth Circuit found that it was a reasonable investigative detention where officers had "near-certain information that one of the 20 cars contained a fleeing, armed

bank robber," they noticed that an individual in one of the cars "began acting suspiciously and refused to comply with police commands," and they subsequently ordered him to the ground, handcuffed him, and sat him on a curb until they identified the bank robber. *See* 782 F.3d 1162, 1175 (10th Cir. 2015).

In contrast, in *United States v. King* the Tenth Circuit found that an officer acted unreasonably in effecting an investigative detention. *See* 990 F.2d 1552, 1563 (10th Cir. 1993). The officer had approached defendant's car "not for any investigative purpose, but to alleviate what she perceived as a traffic hazard resulting from [the defendant]'s incessant honking at the intersection, and she ordered [the defendant] out of the car, again not for any investigative purpose, but to alleviate a perceived threat to the safety of herself and the bystanders" upon noticing that defendant had a gun within reach in the car. *Id.* at 1559. The Tenth Circuit held that "when a police officer initiates an encounter with a person for a purpose other than to investigate criminal activity, the governmental interest in effective crime prevention and detection is irrelevant." *Id.* at 1560.

The officers' conduct here was less intrusive than that in *Shareef*, *Perdue*, and *Paetsch*, which all likewise involved individuals suspected of being armed. Whereas the officers in those cases forcibly removed the suspects from cars—at gunpoint in *Shareef* and *Perdue*—and subsequently restrained them, here the Denver defendants requested Mr. Brown deboard the train without any resort to their own guns, and restrained Mr. Brown only upon confirming that he was armed. Corporal Seiwald used the handcuffs to "maintain the status quo" of the detention while he conducted the pat-down and confirmed whether Mr. Brown was the suspect.

It is true that Mr. Brown was fully cooperative; that Mr. Brown himself informed the Denver defendants that he possessed a firearm; and that this was not an active crime scene or a

17

hot pursuit of a fleeing suspect. But unlike the situation in *King*, where encounter was not initiated for investigative purposes and the officer had no reason to suspect the defendant of a crime, here Mr. Brown was the suspect in shooting. *See King*, 990 F.2d at 1563. The Denver defendants were justified in placing Mr. Brown in handcuffs upon learning that he was armed. As such, I find that the Denver defendants did not violate the Fourth Amendment by using handcuffs on Mr. Brown.

### D. Formal Arrest

"[W]hen a warrantless arrest is the subject of a §1983 action, in order to succeed, a plaintiff must prove that the officer(s) lacked probable cause." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008). "Probable cause exists 'when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed' and that the person or property was involved in the crime." *Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007)). The "relevant question is whether there was a 'substantial probability'— 'something more than a bare suspicion'— that the person or property was involved in a crime." *Id.* (quoting *Cortez*, 478 F.3d at 1116).

The encounter became an arrest once Mr. Brown admitted that he was carrying a concealed weapon without a license. The Denver defendants knew this to be a violation of the law, namely, Denver Revised Municipal Code § 38-117. The Denver defendants conducted a more thorough search incident to arrest and moved Mr. Brown to a DPD vehicle. Mr. Brown does not argue that the Denver defendants lacked probable cause to arrest him at this stage of the encounter; he argues only that he "was arrested well before that moment." ECF No. 45 at 20.

As such, I find that the Denver defendants did not violate the Fourth Amendment by formally arresting Mr. Brown.

Accordingly, I find that the Denver defendants did not violate Mr. Brown's Fourth Amendment rights during this encounter.  Because I find no constitutional violation, I do not conduct a qualified immunity analysis.

## ORDER

Defendants' motion for summary judgment, ECF No. 38, is GRANTED.  The Court enters summary judgment dismissing both of plaintiff's claims.

DATED this 16th day of June, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge